IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RONALD SINGLETON,
      Plaintiff,

vs.

                                      Case No. 3:03cv581/MCR/EMT

JO ANNE B. BARNHART,
Commissioner of the
Social Security Administration,
Defendant.

_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.

I.      PROCEDURAL HISTORY

      Plaintiff filed an application for disability benefits on April 6, 2001, alleging an onset of

disability on December 31, 1999 (Tr. 19-20, 41-42).[1]  The application was denied initially and on reconsideration (Tr. 19).   On November 9, 2001, Plaintiff requested a hearing before an administrative law judge ("ALJ") (Tr. 35-36).  A hearing was held on September 30, 2002 (Tr. 37-75).  Plaintiff was represented by counsel and testified (Tr. 42-67, 72-74).  A vocational expert ("VE"), Scott Lankford, also testified (Tr. 67-72).  On May 16, 2003, the ALJ rendered a decision denying Plaintiff's applications for a period of disability and DIB (Tr. 16-25).

On or about May 26, 2003, Plaintiff wrote the ALJ requesting that he reconsider his decision of May 16, 2003 (Tr. 13-15).  In the letter, Plaintiff asserts that the ALJ failed to consider evidence of his "biggest complaint which is musculoskeletal . . . or any prognosis from doctors after 30 September 2002" (Tr. 14).  Specifically, Plaintiff alleges that the ALJ failed to consider a possible diagnosis of Parkinson's Disease, made in October 2002 or March 2003 (*id.*).[2]  The record does not contain a response to Plaintiff's letter.  On June 26, 2003, Plaintiff requested that the Appeals Council review the ALJ's decision (Tr. 10) and attached to his request a letter similar to the one sent to the ALJ in May 2003 (Tr. 11-12).  On July 3, 2003, Plaintiff faxed a letter to the ALJ stating that as of that date he had begun treatment for Parkinson's disease (Tr. 9).  He again requested review of the May 16, 2003 decision, pointing out that the VE had testified that if his tremors were found to be a permanent disorder, he would be unemployable (*id.*).

In response to Plaintiff's requests for review, on August 29, 2003, the Appeals Council advised Plaintiff he could supplement the record, within thirty days, with any evidence that was "new *and* material to the issues considered in the hearing decision dated May 16, 2003" (Tr. 7).  On October 22, 2003, the Appeals Council denied Plaintiff's request for review (Tr. 3-5) after receiving and considering the following additional evidence submitted by Plaintiff: (1) Dr. Michael Delaney's consultation report dated April 16, 2003 (Tr. 6), (2) Dr. Delaney's consultation report dated July 3,

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on March 10, 2004 (Doc. 5 at 1-305) and the Supplemental Transcript filed on February 24, 2005 (Doc. 15 at 306-23).

[2] According to Plaintiff, in October 2002, due to decreased coordination and worsening tremors, his primary care physician, Dr. Dinelli, referred him to Dr. Pelaez at West Florida Medical Center for Parkinson's disease testing (Tr. 14).  The Transcript of Social Security Administration Record does not contain records from Dr. Pelaez or West Florida Medical Center.  In April 2003, Plaintiff was referred to Dr. Delaney for a second opinion and was diagnosed with probable Parkinson's disease (Tr. 14, 311-14).

2003 (*see* Doc. 13, Doc. 15 at 1 (Supplemental Certification)), and (3) medical records from the Naval Hospital dated August 28, 2003 (Tr. 6).  The Appeals Council's action (i.e., denial of Plaintiff's request for review) made the ALJ's decision the final decision of the Commissioner, and therefore subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998). Plaintiff's appeal from the final decision of the Commissioner is now before this court.

II.     FINDINGS OF THE ALJ

On May 16, 2003, the ALJ made several findings relative to the issues raised in this appeal. The ALJ found that: (1) Plaintiff meets the nondisability requirements for a period of disability and DIB set forth in Section 216(i) of the Social Security Act and is insured for benefits through May 16, 2003 (Tr. 24);[3] (2) Plaintiff has not engaged in substantial gainful activity since his alleged onset (*id.*); (3) Plaintiff has an impairment or a combination of impairments that is "severe," but does not meet or medically equal one of the listed impairments in Appendix I, Subpart P, Regulation No. 4 (*id.*); (4) Plaintiff's allegations regarding his limitations are not totally credible (*id.*); (5) [the ALJ] carefully considered all of the medical opinions in the record regarding the severity of Plaintiff's impairments as required by 20 C.F.R. § 404.1527 (*id.*); (6) Plaintiff has the following residual functional capacity ("RFC"): he can lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours during an 8-hour workday, sit 6 hours during an 8-hour workday, requires a sit/stand option, must have ready availability of a restroom, must have hearing protection, and is precluded from exposure to temperature extremes and high humidity (*id.*); (7) Plaintiff's past relevant work (personnel clerk and mobile home salesperson) does not require the performance of work-related activities precluded by his RFC (*id.*); (8) Plaintiff's medically determinable impairments (urinary incontinence, bilateral hearing impairment, and joint pain) do not prevent him from performing his past relevant work (*id.*); and, (9) Plaintiff was not under a "disability" as defined in the Social Security Act, at any time through May 16, 2003, the date of the decision (*id.*).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision

---

[3]Thus, the time frame relevant to this appeal is December 31, 1999 (alleged onset) to May 16, 2003 (date last insured).

is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997).  The Commissioner's decision will not be disturbed if, in light of the record as a whole, the decision appears to be supported by substantial evidence.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do previous work, "but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps. A finding of nondisability at any step renders further evaluation unnecessary.  The steps are:

1.      Is the individual performing substantial gainful activity?

2.      Does the individual have any severe impairment(s)?

3.      Does the individual have any severe impairment(s) that meet or equal those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?

4.      Can the individual perform past relevant work?

5.      Based on the individual's age, education, and work experience, can he perform work of the sort found in the national economy?

The claimant bears the burden of establishing a severe impairment that keeps him from performing past work.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant is capable of performing.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.   PLAINTIFF'S MEDICAL AND PERSONAL HISTORY

A. Personal History

Plaintiff testified at his hearing before the ALJ as follows.  He was born on July 16, 1958, making him 44 years old at the time of the hearing (Tr. 42).  He is married with two minor children (id.).  Plaintiff served in the military from December 19, 1976 to December 31, 1999 (Tr. 47), including service in both the Army and Navy (Tr. 48).  Most of his military career was spent performing special operation missions (id.).          During the last two years of his military career, Plaintiff was unable to perform his regular military duties (Tr. 54).  He was excused from all formations, allowed to call in for morning muster instead of appearing in person, allowed to adjust his work hours to accommodate his medical conditions, and excused from the physical fitness test (id.).  During the last part of his active duty career, he was an instructor, which required forty-five minute blocks of instruction before a class of twenty to thirty people (id.).  By the time he retired, he was not able to instruct for the forty-five minute time period (id.).  He was relieved of his duty as an instructor after nine months (id.).

Upon Plaintiff's military retirement, he worked for Paul Harbor Mobile Homes as a salesperson (Tr. 52).  He sat most of the time, but walked when he showed  homes on the lot (Tr. 52-53).  He worked there for only two months, quitting mainly because of increased blood in his urine and advice from his doctor that he should "find another form of occupation" (Tr. 53).  He was unable to find a job requiring less physical activity than the sales position (Tr. 54).

At the time of the hearing, Plaintiff was a student at George Stone Technical College in the

cabinet making program; however, his teacher made exceptions to accommodate his impairments (Tr. 44). For example, he was allowed to adjust his body and make frequent trips to the restroom (*id.*). His use of certain power tools, especially vibrating ones, was limited, and he was allowed extra time on projects (Tr. 44-45). Moreover, due to his medical conditions, he was not able to complete the full school day and typically used his allotment of four excused and four unexcused absences each month (Tr. 47).

Plaintiff's medical problems began during his military career (Tr. 49). As a result of "[h]igh impact, high altitude" parachute jumps, Plaintiff broke multiple bones, resulting in joint pain (*id.*). He also experiences unexplained pain in joints he did not injure and has "some type of bone/joint disorder" (*id.*). He has pain in his pelvic area and "problems with urination" due to an enlarged bladder, which requires him to "self-catheterize" four to five times a day (Tr. 50). He experiences an urgent need to urinate fourteen to fifteen times a day (Tr. 51). He also has hearing loss in both ears (Tr. 54-55). Finally, several months prior to the hearing, Plaintiff began experiencing tremors in his left (dominant) hand, for which he was referred to a neurologist (Tr. 55).

Plaintiff takes amitriptyline and Lortab for pain and Indocin for arthritis and joint swelling (Tr. 56-57). His joint pain is, on average, a three to four,[4] and humidity increases his pain level to a seven (Tr. 57-58). His prostate and bladder pain are typically a six or seven (Tr. 57). Additionally, due to his pain and medical conditions, Plaintiff has difficulty sleeping (Tr. 58).

Plaintiff usually wears T-shirts and pants with elastic waistbands due to trouble manipulating buttons (Tr. 59). He has difficulty raising his hands above his shoulders for any length of time, so he keeps his hair short and shaves with an electric razor (*id.*). He has lost strength in his upper extremities and has trouble changing positions, such as from squatting to standing (Tr. 60). He can drive a car, but does so only when his wife is absent because he has difficulty driving for more than thirty minutes (Tr. 60-61). He used to do art work as a hobby, but is no longer able to do so (Tr. 61). B.    Relevant Medical History

        1.    Records contained in the record prior to the decision of the ALJ

---

        [4]The court assumes Plaintiff is using the typical pain scale of zero to ten, where zero represents no pain and ten represents the worst pain.

On July 10, 1996, Plaintiff presented to a military medical clinic with complaints of recently developed swelling in his ankle after running over the weekend (Tr. 155).  X-rays revealed a fracture of his right ankle, and a cast was applied (Tr. 152-53).  On November 12, 1996, Plaintiff underwent a five-year medical examination (Tr. 276).  On the Report of Medical History form, Plaintiff marked that he had swollen or painful joints, hearing loss, "trick" or locked knee, and foot trouble (*id.*).  He further wrote that most of his joint problems arose from injuries received while on active duty (Tr. 277).  Specifically, his left leg was in a cast four times, his right leg was in a cast six times, and he broke his pelvis twice (*id.*).

Plaintiff was first referred to a urologist for an enlarged prostate on November 26, 1996 (Tr. 150).  At that time, he had no voiding complaints (*id.*).  He was examined by Dr. Berlot, who opined that Plaintiff's examination was normal (*id.*).  Plaintiff was instructed to return to the clinic for problems or questions (*id.*).

Plaintiff was evaluated in the urology clinic at Naval Hospital Pensacola on July 17, 1997 for complaints of abdominal pain  (Tr. 146).  At that time, he reported needing to urinate twice during the night, post-void urinary dribbling, urinary urgency and frequency, strong smelling urine, and incomplete bladder emptying (*id.*).  Dr. Vukovich's impression was prostatitis[5] and hematuria (blood in the urine), and he ordered antibiotics and a repeat urinalysis following the antibiotics (*id.*).  Plaintiff returned to the urology clinic on October 8, 1997 and was seen by K.G. Mahaffey, M.D., whose impression was chronic prostatitis (Tr. 144).  Dr. Mahaffey ordered a urine culture and antibiotics and instructed Plaintiff to follow up in two months (*id.*).  Plaintiff followed up with Dr. Mahaffey on December 6, 1997 (Tr. 143).  Dr. Mahaffey's impression continued to be chronic prostatitis, and he ordered a cystoscopy (*id.*).

Plaintiff was evaluated by physician's assistant (P.A.) G. R. Schuetz on September 10, 1998 for complaints of pain in his hands, wrists, elbows, shoulders, knees, ankles, and low back (Tr. 261-62).  X-rays and blood tests were performed, but showed no degenerative joint disease (Tr. 261).  Plaintiff was prescribed medication and referred to a rheumatologist (258-62).

---

[5]Prostatitis is an infection or inflammation of the prostate gland.  Prostatitis, *available at* http://www.emedicine.com/emerg/topic488.htm (Last updated April 25, 2005).

Plaintiff was seen by John Luetkemeyer, M.D., on September 30, 1998, with complaints of low back, knee, and hand pain (Tr. 258-59).  Dr. Luetkemeyer noted that Plaintiff appeared to be cold.  He also noted bilateral internal rotation and abduction of the shoulders, suggestive of rotator cuff pathology, and crepitus in the right knee and right ankle (Tr. 259).  Dr. Luetkemeyer's assessment was polyarthralgias,[6] most likely related to a very early degenerative process secondary to repeated trauma, abnormal but not necessarily pathological patellar reflexes, and cold intolerance (*id.*).  Dr. Luetkemeyer planned a bone scan with focal views of the hands and pelvis (*id.*).

On October 5, 1998, Plaintiff returned to P.A. Schuetz for a bone scan order as requested by Dr. Luetkemeyer (Tr. 257).  A nuclear bone scan was ordered for October 13, 1998, and Plaintiff was instructed to return to the clinic on October 15, 1998 (*id.*).

Plaintiff presented to the Naval Hospital outpatient clinic requesting a waiver from the physical readiness test ("PRT") on October 20, 1998, secondary to his ongoing evaluation for polyarthalgias (Tr. 256).  The physician's assistant noted that Plaintiff had a mild antalgic gait.[7]  The PRT requirements were waived, and Plaintiff was instructed to continue with his previous treatment recommendations (*id.*).

On February 18, 1999, Plaintiff was seen by P.A. Schuetz for tendinitis in his left ankle and polyarthritis for which he was prescribed Motrin (Tr. 141).  On May 18, 1999, Plaintiff followed up with Dr. Mahaffey for his prostatitis, which was being treated with Cardura (Tr. 140).  At that visit, Plaintiff had an International Prostatic Symptom Score ("IPSS") of 30 (*id.*).[8]  Dr. Mahaffey scheduled Plaintiff for a cystometrogram and continued his Cardura (*id.*).

Plaintiff followed up with Dr. Mahaffey on June 18, 1999 (Tr. 139).  Dr. Mahaffey's impression was a large capacity bladder with probable detrusor myopathy (*id.*).[9]  Dr. Mahaffey

---

[6]Polyarthralgia is pain in multiple joints.  Dorland's Illustrated Medical Dictionary, *available at* http://www.mercksource.com/pp/us/cns/cns_hl_dorlands (2002).

[7]Antalgic gait refers to a posture or gait assumed in order to avoid or lessen pain.  Antalgic Gait, *available at http://sprojects.mmi.mcgill.ca/gait/antalgic/intro.asp* (Last updated May 15, 1999).

[8]A IPSS of greater than 20 indicates severe prostatic hyperplasia symptoms.  Benign Prostatic Hyperplasia Symptom Index, *available at* http://www.fpnotebook.com/URO9.htm (Last updated September 2, 2005).

[9]Detrusor myopathy is a disorder of the detrusor muscle of the bladder, which serves to contract and expel urine. Dorland's Illustrated Medical Dictionary, *available at* http://www.mercksource.com/pp/us/cns/cns_hl_dorlands (2002).

discussed self-catheterization with Plaintiff and instructed him to follow up in four months (*id.*).

On October 26, 1999, a medical assessment was performed by Dr. Stone for military retirement purposes (Tr. 215-16). Plaintiff reported prostate problems, bladder problems, and arthritis (Tr. 215). He also complained of low tolerance for cold, gingivitis due to his inability to floss properly because of wrist pain, and possible hearing loss (*id.*). Dr. Stone noted that in the past Plaintiff had an extensive work up for chronic polyarthralgias in his "wrists, hands, ankles, etc.," secondary to degenerative joint disease (Tr. 216). Plaintiff complained of pain "about all the time," which was exacerbated by weather changes (*id.*). Dr. Stone also noted gum disease, intermittent pelvic pain since a jump injury in 1984, treatment for hematuria and prostate problems, asbestos exposure, and possible basal cell carcinoma (*id.*).

Plaintiff was seen by Dr. Mahaffey on May 5, 2000 (Tr. 138). Dr. Mahaffey noted that Plaintiff was on clean intermittent self-catheterization every four to five hours and that Plaintiff stated he dribbled between catheterizations and needed a small incontinence pad (*id.*). Dr. Mahaffey instructed Plaintiff to continue with self-catheterization and ordered a cystometrogram, which was performed on June 15, 2000 (Tr. 137-38). Plaintiff was seen in follow up by Dr. Mahaffey on June 21, 2000 and was instructed to continue self-catheterization and return in one year (Tr. 136).

On June 13, 2001, Plaintiff followed up with Dr. Mahaffey regarding his detrusor myopathy (Tr. 248). Plaintiff stated that he was catheterizing himself every four hours and that he had a sense of urinary urgency (*id.*). According to Dr. Mahaffey, Plaintiff was "doing well," and he recommended continued self-catheterization and follow up in one year (*id.*).

Plaintiff was seen by Dr. Richard Temple on July 10, 2001 for complaints of progressively worsening bilateral ankle, shoulder, and wrist pain (Tr. 247). Dr. Temple noted that Plaintiff's strength was 5/5, but limited by pain (*id.*). Wrist x-rays revealed mild degenerative changes (*id.*). Dr. Temple's assessment was osteoarthritis, and he recommended that Plaintiff continue exercise as tolerated, continue Indocin, and consider a rheumatology consultation (*id.*).

On October 22, 2001, Plaintiff was again seen by Dr. Temple for complaints of joint pain (Tr. 246). Dr. Temple noted Plaintiff's history of detrusor myopathy. He also noted that Plaintiff changes incontinence pads four times per day, self-catheterizes five to six times per day, and voids approximately every forty minutes during the day and approximately five times during the night

(*id.*).  Dr. Temple noted that Plaintiff's arthritis had improved on Indocin, but ordered a consultation with rheumatology for severe osteoarthritis (*id.*).

## 2.    Records submitted by Plaintiff after the decision of the ALJ

Plaintiff was seen by a neurologist, Dr. Michael Delaney, on April 16, 2003 for early symptoms of Parkinson's disease (Tr. 311).[10]  Dr. Delaney noted Plaintiff's history of joint pain beginning in 1986 and bladder problems with prostate hypertrophy (*id.*).  Dr. Delaney also noted that Plaintiff reported he started developing academic problems in 1996 when he was still on active duty and had difficulty passing the chief's test (Tr. 311-12).  Plaintiff reported short-term memory problems, which Dr. Delaney documented were present that day (Tr. 311).  Plaintiff also reported developing gait problems in 1997, a left hand tremor in 2000, and action myoclonus[11] when he was tired (Tr. 312).  Additionally, Plaintiff's left hand became more uncoordinated around 2000, causing him to have difficulty typing and tying his shoe laces (*id.*).  Plaintiff reported that his gait had stiffened, and he experienced a lot of leg pain (*id.*).  He also noticed that his steps had become shorter and he had to hesitate to think about where to step (*id.*).  He turns "in block" and his gait is unsteady  (*id.*).  Plaintiff reported that he felt his symptoms had worsened slightly since 1999 (*id.*).  Motor examination revealed cogwheel rigidity,[12] more pronounced in the left arm than the right (Tr. 313).  Strength overall was five out of five in the right arm and leg and four out of five in the left arm and leg, worse in his hands and feet (*id.*).  According to Dr. Delaney, "[r]apid alternating movements [were] decreased on the right side.  More signs of dysdiadochokinesia than

---

[10]Parkinson's disease is chronic progressive central nervous system neurodegenerative disease.  Parkinson Disease, *available at* http://www.emedicine.com/pmr/topic99.htm (Last updated September 30, 2005).  The first symptom usually is a unilateral resting tremor of the hand.  *Id.*  Other common clinical features include cogwheel rigidity (*see* footnote 11, below), bradykinesia, myoclonus, and postural instability.  *Id;* Myoclonus Fact Sheet, *available* at http://www.ninds.nih.gov/disorders/myoclonus/detail_myoclonus.htm  (Last updated October 13, 2005).

[11]Myoclonus is the sudden, involuntary jerking of a muscle or group of muscles.  Myoclonus Fact Sheet, *available* at http://www.ninds.nih.gov/disorders/myoclonus/detail_myoclonus.htm  (Last updated October 13, 2005).  Action myoclonus is characterized by muscular jerking triggered or intensified by voluntary movement or even the intention to move.  *Id.*  It may be made worse by attempts at precise, coordinated movements.  *Id.*  Action myoclonus is the most disabling form of myoclonus and can affect the arms, legs, face, and even the voice.  *Id.*

[12]Cogwheel rigidity is the phrase used to describe the feeling of periodic resistance to passive movement felt by the examiner in a parkinsonian limb.  The cogwheeling is in fact a tremor superimposed on lead pipe rigidity.  Cogwheel Rigidity, *available at*  http://www.gpnotebook.co.uk/cache/1422917636.htm (2003).

bradykinesia."[13] (*id.*).  Plaintiff's gait was wide-based, he turned "in block," and he had some evidence of retropulsion on testing (*id.*).[14]  Dr. Delaney's assessment was that Plaintiff "was a patient with probable early Parkinson's disease, except it could be due to organophosphates or toxic exposure in the past" (*id.*).  Dr. Delaney did not start Plaintiff on medications at that point, but planned to follow up with Plaintiff in one month to review test results with him (*id.*).

Plaintiff followed up with Dr. Delaney for his Parkinson's symptoms on July 3, 2003 (Tr. 314).  Dr. Delaney prescribed Sinemet and instructed him to return in another month (*id.*).  On July 8, 2003, Dr. Delaney signed an application for a disabled person parking permit on Plaintiff's behalf, certifying that Plaintiff was a disabled person with a permanent disability that limits or impairs his ability to walk 200 feet without stopping to rest (Tr. 310).  Dr. Delaney marked "[s]evere limitation in a person's ability to walk due to an arthritic, neurological, or orthopedic condition" as Plaintiff's specific disability (*id.*).

Plaintiff was next seen in the Naval Hospital neurology clinic by Dr. Troy Anderson on August 28, 2003 (Tr. 308).  Dr. Anderson noted that Plaintiff was last seen by Dr. Delaney in July 2003, when he was diagnosed with Parkinson's and prescribed Sinemet for treatment (*id.*).  Dr. Anderson further noted that Dr. Delaney had completed an extensive work up, but found no reversible etiologies for his symptoms (*id.*).  The Sinemet had helped Plaintiff, but he continued to experience stiffness and tremors, as well as walking, balance, and memory difficulties (Tr. 308).  Motor examination revealed increased cogwheel tone, left greater than right, and five out of five strength in all extremities (*id.*).  Gait and station examinations were normal without retropulsion (*id.*).  Dr. Anderson noted a right sided resting tremor as well as position tremor (*id.*).  His assessment was Parkinsonism, and he planned to continue the Sinemet and add Mirapex (*id.*).  Additionally, he referred Plaintiff to Dr. Watts at the University of Alabama for possible deep brain stimulation surgery (*id.*).

C.      Other Information Within Plaintiff's Claim File

---

[13] Dysdiadochokinesia is the impaired ability to perform rapid, alternating movements.  Dorland's Illustrated Medical Dictionary, *available at* http://www.mercksource.com/pp/us/cns/cns_hl_dorlands (2002).  Bradykinesia is abnormal slowness of muscular movement.  *Id.*

[14]Retropulsion is a tendency to walk backward involuntarily, seen in some varieties of Parkinsonism.  *Id.*

Consulting physician, Richard W. Lucey, M.D., examined Plaintiff on July 3, 2001 (Tr. 224). Plaintiff reported chronic difficulty with bladder distention and an inability to empty his bladder (Tr. 224).  According to Dr. Lucey, it had been speculated that this may have been the result of military missions in which Plaintiff had to avoid urination for extended periods of time, which may have caused some overdistention of his bladder and ultimately weakened the muscle (*id.*).  Plaintiff reported that he was currently utilizing self-catheterization, and without it he had to void in small quantities thirty times a day (*id.*).  Plaintiff had recurrent bladder infections, but was doing better on self-catheterization (*id.*).  Plaintiff also reported joint pain from numerous knee injuries, as well as pain and stiffness in his hands, wrists, and elbows (*id.*).  His medications included ibuprofen, Lortab, and Indocin (Tr. 225).  He had previously taken Cardura, but quit because it did not help his bladder problems (*id.*).  On physical examination, Plaintiff had mild hypertrophic changes in his fingers, but his grip and fine manipulatory movements were normal (*id.*).  He had mild subjective discomfort in his wrists, but normal range of motion with no obvious joint abnormalities (*id.*). Plaintiff had moderate hypertrophic changes in his knees, with mild crepitus present bilaterally, and the range of motion of his thoracolumbar spine was mildly decreased (*id.*).  Dr. Lucey's assessment was degenerative arthritis in the hands and knees and bladder dysfunction requiring chronic self-catheterization (Tr. 226).

David Guttman, M.D., a board certified pediatrician, performed a physical RFC assessment on July 18, 2001 (Tr. 229-36).  Dr. Guttman noted that Plaintiff was a 42 year old male with bladder dysfunction requiring self-catheterization and complaints of pain in his knees and wrists due to numerous injuries (Tr. 230).  On physical examination, Dr. Guttman noted mild hypertrophic changes in Plaintiff's fingers with normal grip and fine manipulation abilities (Tr. 231).  Dr. Guttman documented that Plaintiff's symptoms were credible and consistent with degenerative arthritis of the hands, back, and knees (Tr. 234).  Dr. Guttman opined that Plaintiff could occasionally lift/carry twenty pounds; frequently lift/carry ten pounds; and, stand, walk or sit about six hours in an eight-hour workday (Tr. 230).  Plaintiff could also climb, balance, stoop, kneel, crouch, and crawl only occasionally due to his degenerative arthritis (Tr. 231).  Plaintiff had no manipulative, visual, communicative, or environmental limitations (Tr. 232-33).

The Department of Veteran's Affairs issued a rating decision on October 2, 2001, in which

Plaintiff was found to be thirty percent disabled due to his bladder condition and twenty percent disabled due to his polyarthralgia (Tr. 291).

On October 17, 2001, a second pediatrician, Mary Elizabeth Seay, M.D., completed a physical RFC assessment (Tr. 237-44). Dr. Seay noted that Plaintiff was a 43 year old male alleging degenerative arthritis and bladder problems, which he managed by self-catheterization (Tr. 238). On physical examination, Dr. Seay noted mild hypertrophic changes in the distal interphalangeal joints of the fingers with normal grip and dexterity, moderate hypertrophic changes in the knees with mild crepitus, and mildly decreased range of motion in the lumbar spine (*id.*). Dr. Seay documented that Plaintiff's symptoms were credible and noted that Plaintiff must have free access to a restroom on the job (Tr. 242). According to Dr. Seay, Plaintiff could occasionally lift/carry twenty pounds; frequently lift/carry ten pounds; and, stand, walk or sit about six hours in an eight-hour workday (Tr. 238). Plaintiff could also climb ramps and stairs and balance frequently. However, he could climb ladders, ropes, and scaffolds, and could stoop, kneel, crouch, and crawl only occasionally due to his degenerative arthritis (Tr. 239). Plaintiff has no manipulative, visual, or communicative limitations, but should avoid concentrated exposure to hazards, such as machinery or heights, due to his degenerative arthritis (Tr. 240-41).

On September 24, 2002, the Department of Veteran's Affairs issued a rating decision, increasing Plaintiff's disability rating from 30% to 60% based on his bladder condition/detrusor myopathy (Tr. 129). According to the rating decision, medical records support Plaintiff's claims that he suffers from detrusor myopathy and must change his urinary incontinence pads four times a day, self-catheterize five to six times a day, and void approximately every forty minutes (Tr. 130).

On September 27, 2002, Brian Metcalf, Plaintiff's instructor at George Stone Technical College, wrote a letter regarding his observations of Plaintiff's abilities (Tr. 124). Mr. Metcalf stated that Plaintiff had informed the school of a bladder dysfunction, which interfered with sustained work, and a musculoskeletal problem, which limited his use of power tools due to a quick loss of gripping strength with repetitive motion (*id.*). Mr. Metcalf further stated that Plaintiff was observed on a daily basis having difficulty remaining in one position for any length of time and changing positions to attempt to relieve his pain (*id.*). Mr. Metcalf observed that Plaintiff had a very noticeable stiff gait even when ambulating short distances (*id.*). It was Mr. Metcalf's opinion that

Plaintiff would not be able to function productively in the workforce for any length of time due to his medical problems (*id.*).

Dr. T.F. Mott completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on September 27, 2002 (Tr. 297-98).  According to Dr. Mott, Plaintiff was not limited in his ability to understand, remember or carry out instructions, nor was he limited in his ability to respond appropriately to supervision, co-workers, or work pressures (*id.*).  However, Dr. Mott stated that Plaintiff must be allowed to use the restroom every thirty minutes (Tr. 298).  Dr. Mott also completed a Medical Source Statement of Ability to do Work Related Activities (Physical) on September 27, 2002 (Tr. 299-300), in which he indicated that Plaintiff was able to lift fifty pounds occasionally, stand/walk at least two hours in an eight-hour workday and sit less than six hours in an eight-hour workday (Tr. 300).  Plaintiff must periodically alternate between standing and sitting and was limited by approximately 50% in pushing/pulling with upper and lower extremities due to polyarthralgia (*id.*).  Plaintiff was never able to climb; occasionally able to kneel, crouch, crawl, and stoop; and frequently able to balance (*id.*).  Plaintiff was also limited in reaching, handling, and fingering and was only able to use those skills occasionally (Tr. 301).  Plaintiff was limited in hearing with a 30 to 40 decibel loss (*id.*).  Finally, Plaintiff had the following environmental limitations: temperature extremes, humidity/wetness, hazards, and vibration (Tr. 302).

Although the physical Medical Source Statement was initially completed by Dr. Mott, on October 9, 2002, Dr. Dinelli clarified the statement to reflect that Plaintiff was unable to frequently carry ten pounds or less (Tr. 305).  He also documented that Plaintiff could stand or walk at least two hours in an eight-hour workday (*id.*).

V.      DISCUSSION

Plaintiff raises three issues on appeal (Doc. 7 at 9).  Plaintiff contends the Appeals Council failed to consider new and material evidence concerning Plaintiff's Parkinson's disease; the ALJ erroneously failed to consider all of Plaintiff's severe medical conditions and, in so doing, ignored the opinion of Plaintiff's treating physicians regarding Plaintiff's physical limitations; and, the ALJ erroneously found that Plaintiff's testimony was not fully credible.

A.      Appeals Council's Review of New Evidence

Plaintiff asserts that the Appeals Council erroneously failed to consider new and material evidence concerning his Parkinson's disease (Doc. 7 at 12), while Defendant contends that such evidence was properly considered by the Appeals Council (Doc. 8 at 11).

Additional evidence is specifically permitted to be provided to the Appeals Council if the evidence is both new and material.  *See* 20 C.F.R. § 404.970(b).  The new evidence is then evaluated by the Appeals Council to determine whether a basis exists for changing the ALJ's decision.  Falge v. Apfel, 150 F.3d 1320, 1322 n. 4  (11th Cir. 1998).  Whether the Appeals Council accepts the case for review or denies review, as in the instant case, new evidence first submitted to the Appeals Council is part of the administrative record that goes to the district court for review.  Keeton v. Dep't of Health and Human Services, 21 F.3d 1064, 1067 (11th Cir. 1994).  Furthermore, if the Appeals Council has denied review, like here, the district court can look only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence.  Falge, 150 F.3d at 1323.  However, in the instant case, Plaintiff seeks a remand "for a determination considering all relevant medical evidence" (Doc. 7 at 12).  In this scenario, the district court may properly consider evidence submitted only to the Appeals Council in determining whether a remand is appropriate.  Falge, 150 F.3d at 1323; 42 U.S.C. § 405(g).

Section 405(g) permits courts to remand a case to the Social Security Administration for consideration of newly discovered evidence.  To succeed on a claim that remand is appropriate, Plaintiff must show that (1) new, noncumulative evidence exists, (2) the evidence is material such that a reasonable possibility exists that the new evidence would change the administrative result, and (3) good cause exists for the applicant's failure to submit the evidence at the appropriate administrative level.  *See* Cannon v. Bowen, 858 F.2d 1541 (11th Cir.1988); *see also* Keeton, 21 F.3d at 1067.

Plaintiff's hearing before the ALJ was held on September 30, 2002.  At that time Plaintiff testified, among other things, that he had tremors in his left hand for several months and had been referred to a neurologist (Tr. 55).[15]  On May 16, 2003, the ALJ denied Plaintiff's application for benefits.  On May 26, 2003, Plaintiff wrote the ALJ requesting that he reconsider his decision.

---

[15]Tremors can be a sign of Parkinsonian syndrome (*see* footnote 10, above, and footnote 19, below).

According to Plaintiff's letter, due to decreased coordination and worsening tremors, his primary care physician referred him to Dr. Pelaez at West Florida Medical Center for Parkinson's disease testing in October 2002 (Tr. 14).  According to Plaintiff, Dr. Pelaez's "prognosis was Parkenson's [sic] Disease, but [the doctor] wanted further testing" (*id.*).[16]  Plaintiff was then referred to Dr. Delaney, a neurologist, for a second opinion (*id.*).  Plaintiff advised the ALJ that he saw Dr. Delaney for the first time on April 16, 2003 and was diagnosed with probable early Parkinson's disease (Dr. Delaney's records were not part of the record at the time of Plaintiff's hearing).  Per Plaintiff, Dr. Delaney did not begin medication at that time, but instead decided to see Plaintiff one month later to discuss further test results (*id.*)  Additionally, Plaintiff advised the ALJ that Parkinson's disease had not been ruled out and that he was scheduled for additional testing in July (*id.*).  The record does not contain a response to Plaintiff's letter.

On June 26, 2003, Plaintiff requested that the Appeals Council review the ALJ's decision and indicated that he had additional medical evidence to submit (*see* Tr. 7, 10-13).  Plaintiff was advised that he could submit new and material evidence to the Appeals Council (Tr. 7); thus, Plaintiff submitted copies of Dr. Delaney's consultation reports dated April 16, 2003 (finding probable early Parkinson's (Tr. 313)) and July 3, 2003 (finding Parkinson's and beginning treatment for the disease (Tr. 314)), as well as medical records from Dr. Anderson/Naval Hospital dated August 28, 2003 (diagnosing Parkinsonism and recognizing Plaintiff's ongoing therapy for such (Tr. 308)).

In a notice dated October 22, 2003, the Appeals Council acknowledged it had received additional evidence, but denied Plaintiff's request for review, stating "we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council.[17] We found that this information does not provide a basis for changing the Administrative Law Judge's decision" (Tr. 3-6).  However, the Appeals Council's statement provides this court with

---

[16]The Transcript of the Social Security Administration Record does not contain records from Dr. Pelaez or West Florida Medical Center.

[17]The Order of Appeals Council stated that it received a consultation report from Dr. Delaney dated April 16, 2003 and medical records from Naval Hospital dated August 28, 2003 (Tr. 6).  It does not mention the July 2003 records, although it was later determined that those records had in fact been received and considered by the Appeals Council (*see* Doc. 13, Doc. 15 at 1 (Supplemental Certification)).

no reasoned opinion explaining why review was denied or why the new evidence was thought to be immaterial. After conducting its own careful review of the record, this court concludes that Plaintiff's newly submitted evidence meets the three requirements for remand.

First, the additional medical records relate, in part, to doctor visits which occurred <u>after</u> the ALJ hearing, including records that document a new diagnosis of Parkinson's disease. Accordingly, the records are new and non-cumulative, especially considering the fact that prior to the ALJ hearing, Plaintiff's diagnosis of Parkinson's was only "probable."

Second, a reasonable possibility exists that the new evidence would change the administrative result, as the evidence contradicts the ALJ's findings and conclusions regarding the severity of Plaintiff's problems. Plaintiff complained of hand tremors at the ALJ hearing and testified that he had been referred to a neurologist for diagnosis. Thus, symptoms of his disease were present at the time of the hearing, but the disease was not yet diagnosed.[18] In his decision, the ALJ does not reference Plaintiff's tremors and assigns a RFC that includes no limitation related to his tremors. Thus, the ALJ must have concluded that Plaintiff's tremors were not a severe condition. To the contrary, the new records document that within months of the ALJ hearing Plaintiff was definitively diagnosed with Parkinson's disease, a chronic degenerative neurological disease, which was severe enough to warrant consideration of brain surgery. The records also document various limitations Plaintiff experienced due to the disease, such as rigidity, tremors, and weakness, as well as walking, balance, memory, and manipulation difficulties. If the additional records were considered, a disability based on Parkinson's disease might well exist.[19]

Third, Plaintiff must establish that "good cause exists for [] failure to submit the evidence at the appropriate administrative level," <u>Falge</u>, 150 F.3d at 1323. Good cause may be shown, for example, where the evidence did not exist at the time of the administrative decision. <u>Cherry v.</u>

---

[18]The new evidence must be relevant to a condition existing on or before the ALJ's decision, <u>Thomas v. Sullivan</u>, 928 F.2d 255, 260-261 (8th Cir. 1991), as was Plaintiff's, or at least before the final decision of the Appeals Council. Here the Appeals Council's decision was rendered on October 22, 2003 (*see* Tr. 3), well after Plaintiff had clearly been diagnosed with Parkinson's. *See* <u>Smith v. Bowen</u>, 792 F.2d 1547, 1551 (11th Cir. 1986) (Appeals Council shall adequately evaluate new and relevant evidence instead of "perfunctorily adher[ing] to the decision of the ALJ").

[19]Parkinsonian syndrome meets listing 11.06 if the following signs are present: significant rigidity, bradykinesia, or tremor in two extremities, which, singly or in combination, result in sustained disturbance of gross and dextrous movements, or gait and station.

Heckler, 760 F.2d 1186, 1192 (11th Cir. 1985).  Here, unlike Cherry where the additional evidence was not presented until the district court level, Plaintiff presented his additional evidence to the Appeals Council when he requested review, and within the time frame permitted by the Appeals Council.  Additionally, the most important of these records did not exist prior to the ALJ hearing and therefore could not have been submitted at that level.  *See* Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991) (the fact that records did not exist at the time of the hearing serves as sufficient cause to excuse a failure to include them in the administrative proceedings).  Accordingly, Plaintiff has established his entitlement to a remand and, upon remand, the ALJ should consider the new evidence in evaluating Plaintiff's disability claim.

      B.     Treating Physician's Opinion

      Plaintiff alleges that the ALJ erroneously ignored the opinions of his treating physicians regarding his RFC (Doc. 7 at 14-16), while Defendant asserts that the ALJ accorded Plaintiff's treating physicians' opinions substantial weight (Doc. 8 at 15).

      Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Commissioner of Social Security,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

      Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the

length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are the providence of the Commissioner.  20 C.F.R. § 404.1527(e).

According to Dr. Mott,[20] Plaintiff was able to lift fifty pounds occasionally (including upward pulling), stand/walk at least two hours in an eight-hour workday, and sit less than six hours in an eight-hour workday (Tr. 299-300).  Dr. Mott also documented that Plaintiff must periodically alternate between standing and sitting and have access to the restroom every thirty minutes (Tr. 298).  Finally, Dr. Mott documented that Plaintiff was limited in pushing/pulling with upper and lower extremities; limited in reaching, handling, and fingering; and limited in hearing, temperature extremes, humidity/wetness, hazards, and vibration (Tr. 301-02).  Additionally, according to Dr. Dinelli, Plaintiff was unable to carry less than ten pounds frequently (although Plaintiff apparently retained the ability to occasionally lift or carry fifty pounds, including upward pulling), and Plaintiff was able to stand or walk at least two hours in an eight-hour workday (Tr. 305).

As noted by the ALJ, the state agency physicians opined that Plaintiff could lift 20 pounds

---

[20]Although the ALJ refers to Dr. Mott as a treating physician (Tr. 21), it appears that Plaintiff was actually treated by other Navy physicians.  Although Dr. Mott completed the physical Medical Source Statement of Ability to Work, the undersigned has found no treatment records from Dr. Mott in the record.  It is the same situation with Dr. Dinelli.

occasionally and 10 pounds frequently; stand, walk or sit about 6 hours in an eight-hour workday; and push/pull at a level consistent with his ability to lift/carry (Tr. 22).  The ALJ further noted the state agency physicians' opinion that Plaintiff had no manipulative or environmental limitations, but needed free access to the restroom (*id.*).

Ultimately, the ALJ determined that Plaintiff's RFC was the same as that determined by the state agency physicians, except the ALJ's RFC finding included no specific limits on Plaintiff's ability to push/pull.  Additionally, the ALJ included the need for hearing protection and precluded Plaintiff from exposure to temperature extremes and high humidity (Tr. 23).  Accordingly, the only apparent difference in the RFC assessments of Drs. Mott and Dinelli, and that determined by the ALJ, is the ALJ's finding that Plaintiff could stand or walk about six hours a day, while the doctors opined that Plaintiff could do so for "at least" two hours a day.  These conclusions are not necessarily inconsistent, especially considering the ALJ's additional finding that Plaintiff requires "a sit/stand" option (Tr. 23), as indicated by Dr. Mott.  Furthermore, it appears that the ALJ indeed considered Dr. Mott's opinion because he not only included Dr. Mott's sit/stand option, he also included hearing protection within Plaintiff's limitations and limited Plaintiff's exposure to temperature and humidity.  Moreover, the ALJ assessed at least one limitation as being <u>more</u> restrictive than that suggested by Drs. Mott and Dinelli (they opined that Plaintiff could lift or carry 50 pounds occasionally, including upward pulling (*see* Tr. 300, 305), but the ALJ's RFC finding limited Plaintiff's lifting and carrying ability to only 20 pounds).

Finally, the opinions of Drs. Mott and Dinelli are contained on preprinted forms that offer multiple choice answers or other, similar-type answers.  The answers contained on the forms are unexplained, except for notations indicating that Plaintiff suffers from polyarthralgia (Tr. 300, 302), and are accompanied by no clinical or objective findings (*see* Tr. 299-302, 305).  Additionally, the opinions are incomplete and/or inconsistent.  Dr. Dinelli utilized the same four-page form as Dr. Mott, but completed only one page, and that page appears to be a photocopy of page one of Dr. Mott's form, with some additional notations (*compare* Tr. 299 *with* Tr. 305).  Additionally, Dr. Mott failed to answer the question concerning Plaintiff's ability to frequently lift or carry (Tr. 299), while Dr. Dinelli stated that Plaintiff could not frequently lift or carry anything less than ten pounds, even though he believed Plaintiff had the occasional (i.e., "occurring from very little up to one-third of

an 8-hour workday") ability to lift fifty pounds (Tr. 305).  Nonetheless, the opinions are in large part consistent with the ALJ's finding.  To the extent the opinions are inconsistent, a treating physician's opinion may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory (*see* 20 C.F.R. § 404.1527(d)).  This court concludes that the ALJ did not improperly discount the opinions of Plaintiff's treating physicians and that his RFC assessment was based upon substantial evidence in the record.  However, upon remand, the ALJ should reconsider the RFC assessment in light of the new evidence.

Plaintiff also asserts that the ALJ erroneously failed to consider "Plaintiff's severe medical conditions including Parkinson's Disease with tremors in the dominant hand; bladder dysfunction; detrusor myopathy; severe osteoarthritis; and polyarthralgia, degenerative process, secondary to repeated trauma" (Doc. 7 at 11).  The ALJ cannot be faulted for failing to consider evidence that was not before him, such as a definitive diagnosis of Parkinson's disease, and this court cannot consider such evidence in determining whether the decision of the ALJ is supported by substantial evidence.  However, as previously discussed, the ALJ will be directed to consider this evidence upon remand.  Regarding the remaining medical conditions, Plaintiff concedes that the ALJ considered and found severe the following impairments: "'urinary incontinence, bilateral hearing impairment, and joint pain . . .' (Tr. 21)" (Doc. 7 at 11).  Contrary to Plaintiff's suggestion, however, this court concludes that the ALJ considered the remaining conditions because in this situation "bladder dysfunction" and "detrusor myopathy" are essentially synonymous with "urinary incontinence."  Further, "osteoarthritis" and "polyarthralgia" are essentially synonymous with "joint pain."  Accordingly, the ALJ did not err.

C.     Credibility of Plaintiff's Subjective Complaints

Plaintiff argues that the ALJ erroneously found that his testimony was not fully credible and failed to articulate any valid reason in support of this finding (Doc. 7 at 17).  A review of the ALJ's decision reveals that the ALJ articulated two reasons for finding Plaintiff's subjective complaints not fully credible (Tr. 23).[21]  First, because Plaintiff was able to attend a cabinet making school with special accommodations, the ALJ determined that he was "able to perform activity on some level"

---

[21]The ALJ did not specify which of Plaintiff's subjective complaints he discredited, i.e., pain, inability to fasten buttons on clothing, inability to drive long distances, etc.

(*id.*).  Second, the ALJ found inconsistent "the fact that [Plaintiff] went right from the active military

Reserve . . . to an immediate onset of disability associated with his existing chronic medical status"

(*id.*).

At steps 4 and 5 of the evaluation process it is appropriate for the Administrative Law Judge

to consider a plaintiff's daily activities.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987).  If

daily activities are to be considered, however, the Administrative Law Judge must do so in the

context of all of the evidence in the record:

> We have consistently held that in ascertaining whether the [Commissioner's]
> findings are supported by substantial evidence, we do not consider only those parts
> of the record that support those findings, but rather must  "view the entire record and
> take account of evidence in the record which detracts from the evidence relied on by
> the [Commissioner]."

Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986).

The Parker court found the Administrative Law Judge's reliance upon plaintiff's "daily

activities" to discount her testimony regarding pain to have been flawed for failure to consider the

plaintiff's testimony that she had to lie down after two hours of such work.  *Id.*  Similarly, in Foote

v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995), the court held that a conclusory citation to a plaintiff's

"daily activities" as a basis for disbelieving her testimony regarding pain was insufficient where a

medical condition existed that reasonably could have given rise to the pain described, and, although

she testified that she cooked and shopped for herself, she had trouble putting on her clothing.

Additionally, in Lewis the court held that participation in "everyday activities of short duration, such

as housework or fishing," does not disqualify a plaintiff from disability, so long as such activities

are not inconsistent with limitations recommended by the treating physicians. 125 F.3d at 1441.

 Thus, it was proper for the ALJ to consider Plaintiff's school activities in evaluating the

credibility of Plaintiff's subjective complaints.  Additionally, the ALJ's conclusion that Plaintiff is

"able to perform activities on some level" appears to be correct.  However, it is unclear to the court

why Plaintiff's "ability to perform activities on some level" discredits his testimony, especially

because this conclusion is actually consistent with Plaintiff's testimony.[22]  A conclusory citation to

---

[22]Plaintiff testified that he was able to attend cabinet making school, but multiple accommodations were made
for him (Tr. 44-47).

Plaintiff's ability to attend school and perform some activity as a basis for disbelieving Plaintiff's testimony is insufficient.  *See* Foote, 67 F.3d at 1561.

The ALJ's finding that Plaintiff "went right from the active military Reserve . . . to an immediate onset of disability associated with his existing chronic medical status" (Tr. 23) is not supported by substantial evidence in the record.  Plaintiff testified that he was on limited duty for quite some time prior to his actual military retirement (Tr. 54), and there is no evidence to the contrary.  Additionally, Plaintiff's medical records document that he was relieved from fitness requirements in 1998 (Tr. 256).  Accordingly, this court concludes that the ALJ's reasons for discounting Plaintiff's subjective complaints are not supported by the record.

It was within the ALJ's discretion to determine, after listening to Plaintiff's testimony, that his claims of pain and other symptoms were not credible.  *See* Landry v. Heckler, 782 F.2d 1551, 1554 (11th Cir. 1986).  However, the ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place explicit and adequate reasons for rejecting that testimony on the record.  Cannon, 858 F.2d at 1545; MacGregor, 786 F.2d at 1054.  Because the ALJ's reasons for refusing to credit Plaintiff's subjective complaints are not supported by substantial evidence in the record, Plaintiff's testimony must be accepted as true.  Cannon, 858 F.2d at 1545; MacGregor, 786 F.2d at 1054.  On remand, the ALJ must properly consider Plaintiff's subjective complaints in accordance with 20 C.F.R. § 404.1529.[23]  *See also* Holt v. Sullivan, 921 F.2d 1221, 1222-1224 (11th Cir. 1991) (discussing "pain standard" that applies when a claimant attempts to establish disability through his own testimony of pain or other subjective symptoms).

As a final matter, the court notes that the ALJ failed to consider the Department of Veteran's Affairs rating decision issued on October 2, 2001 in which Plaintiff was found to be twenty percent disabled due to his polyarthralgia (Tr. 291).[24]  The ALJ erroneously stated that the Department of

---

[23]The court may remand a case for entry of an order awarding benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  Because the evidence in this case does not clearly establish disability, the court will remand for further proceedings.  *See id.* (the general rule is to reverse and remand for additional proceedings).

[24]Defendant agrees that the Department of Veterans Affairs rated Plaintiff's polyarthralgia as twenty percent disabling  (Doc. 8 at 4).

Veterans Affairs did not give *any* disability percentage based on Plaintiff's allegations of arthritis and joint pain (Tr. 22) (emphasis added).  On remand, the ALJ shall consider this rating decision.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to remand this case to the Administrative Law Judge for further proceedings consistent with this report and recommendation, and that the Clerk be directed to close the file.

At Pensacola, Florida this 28th day of December 2005.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**